UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

THE CIT Group/COMMERCIAL )
SERVICES, INC., )
)
     Appellant, )     Civil No. 12-16-ART
)
v. )
)
CONSTELLATION ENERGY )
COMMODITIES GROUP, )     **MEMORANDUM OPINION**
)     **& ORDER**
and )
)
CONSTELLATION ENERGY GROUP, )
INC., )
)
     Appellees. )

     \*\*\*   \*\*\*   \*\*\*   \*\*\*

In 2008, Black Diamond, a coal company, was forced into bankruptcy. In an effort to limit its losses, CIT Group, one of the companies that financed Black Diamond's operations, sued Commodities, a company that Black Diamond sold coal to and occasionally bought coal from. Both parties moved for summary judgment before the bankruptcy court. The bankruptcy court denied each of CIT Group's claims against Commodities. CIT Group appealed to this Court under 28 U.S.C. § 158(a). For the reasons explained below, the bankruptcy court's decision is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

## BACKGROUND

Harold Sergent formed a coal company called Black Diamond Mining Company, LLC, to buy promising but undeveloped coal assets in Floyd County, Kentucky, and turn a

profit. Sergent Dep., R. 117-1 at 29–30, Ex. 2 at 89–90.[1] Black Diamond immediately started searching for a way to finance this venture and customers to buy the coal. For financing, the company turned to The CIT Group/Commercial Services, Inc., a financial-services company ("CIT Group").

While negotiating its financing agreement, Sergent began finding customers to buy the coal. Franklin Dep., R. 117-2 at 4, Ex. 3 at 20; Sergent Dep., R. 117-1 at 29–30, Ex. 2 at 89–90; Nelson Dep., R. 117-3 at 44, Ex. 8 at 12–14. In May 2006, he negotiated a long-term forward contract with Constellation Energy Commodities Group ("Commodities")—an agreement in which Black Diamond would sell predetermined quantities of coal to Commodities each month at a fixed price per ton between July 1, 2006, and December 31, 2008 ("May 2006 Coal Supply Agreement"). R. 117-4 at 2, Ex. 9 at CIT0535. Commodities is, unsurprisingly, a commodities trader, and it also manages the coal supply for its parent company, Constellation Energy Group, Inc. ("Constellation"). Savage Dep., R. 117-1 at 4, Ex. 1 at 6–8. Constellation, in turn, operates coal-fired power plants. *Id.* Constellation agreed to guarantee Commodities' obligations to Black Diamond under the May 2006 Coal Supply Agreement ("Guaranty Agreement"). R. 117-5 Ex. 18.

As is typical with these sorts of transactions, Commodities and Black Diamond hired the Bank of New York as a collateral agent ("Collateral Agent Agreement"). R. 117-5 at 15, Ex. 17 at CIT0305. As a collateral agent, the Bank of New York served as an impartial intermediary responsible for monitoring and protecting any collateral exchanged between

---

[1] Citations to the Bankruptcy Court's record are indicated by "R." and citations to its opinion are indicated in the following form: *The CIT Grp./Comm. Servs., Inc. v. Constellation Energy Commodities Grp. (In re Black Diamond Mining Co., LLC),* No. 08-7017, 2011 WL 6202905, at *__ (Bankr. E.D. Ky. Dec. 13, 2011). Citations to this Court's record are indicated by a citation to this case, *The CIT Grp./Comm. Servs, Inc. v. Constellation Energy Commodities Grp., Inc. (In re Black Diamond Mining Co., LLC),* No. 12-16-ART (E.D. Ky. 2012), followed by a record citation.

Black Diamond and Commodities under the May 2006 Coal Supply Agreement. *Id.* at CIT0305–0308; Franklin Dep., R. 117-2 at 26, Ex. 3 at 115–16.

Before Commodities and Black Diamond officially began their relationship, CIT Group reviewed the May 2006 Coal Supply Agreement and found its terms acceptable. Franklin Dep., R. 117-2 at 5–6, Ex. 3 at 23, 26; Hudgens Dep., R. 117-4 at 34, Ex. 10 at 40. Black Diamond and Commodities then executed the May 2006 Coal Supply Agreement. Two days later, Black Diamond and CIT Group also finalized their financing relationship. R. 117-4 at 66, Ex. 13 at CIT0292. Black Diamond agreed to sell to CIT Group any accounts receivable[2] generated by coal sales in the ordinary course of business in exchange for an immediate payment from CIT Group—an arrangement called "factoring." *Id.* at CIT0283 ¶ 4.1. The Factoring Agreement, though, permitted CIT Group to factor only accounts receivable generated by coal sales made in the ordinary course of Black Diamond's business (not accounts created through *any* coal sale). Thus, CIT Group ended up with a security interest in the factored accounts receivable, including those arising from sales to Commodities, but CIT Group did not have a general security interest in Black Diamond's coal inventory. *See id.* at CIT0287 ¶ 11.1 (listing types of security interests); *see also* Franklin Dep., R. 117-2 at 11, Ex. 3 at 50–51. To complete its financing arrangements, Black Diamond also entered into long-term "lending facilities"—financial jargon for certain kinds

---

[2] An account receivable is simply a customer's debt to a business for providing goods or services. Because an account receivable represents a right to collect the customer's debt in the future, it is an asset of the business.

of business loans—with CIT Capital USA, an affiliate of CIT Group.[3] R. 117-4 Ex. 13; Franklin Dep., R. 117-2 at 4, Ex. 3 at 20.

Of course, the Factoring Agreement came with strings. As the old saying goes, no business expects to be profitable in its first year, and CIT Group's expectations were no different with respect to Black Diamond. As a result, the Factoring Agreement did not require any minimum volume of factored accounts for the first year. And because CIT Group recognized that most of Black Diamond's coal sales in its first year would come from Commodities under the May 2006 Coal Supply Agreement, the Factoring Agreement also permitted Commodities' invoices to comprise up to 50% of Black Diamond's factored invoices. R. 117-6 at 62–64, Ex. 28 § 6. Naturally, though, CIT Group had higher expectations for Black Diamond's second and subsequent years. So the Factoring Agreement required Black Diamond to factor a "minimum annual volume" of $100 million with CIT Group beginning May 11, 2007. R. 117-4 at 62–63, Ex. 13 § 15.1. CIT Group correspondingly approved Black Diamond's request to allow up to 70% of Commodities' invoices to be factored. R. 117-6 at 62–64, Ex. 28 § 6.

Several months after signing the Factoring Agreement in May 2006, Black Diamond started to find itself in trouble. It had breached its loan agreement with CIT Capital USA by failing to (1) obtain key man life insurance on Sergent;[4] (2) meet certain financial performance requirements; and (3) produce the minimum amount of coal required. R. 117-6 at 68, Ex. 29 at CIT1189. And by breaching its agreement with CIT Capital USA, Black

---

[3] According to CIT Group's Vice President, CIT Group is a subsidiary of The CIT Group/Equipment Financing, Inc., which is a subsidiary of CIT Group, Inc. CIT Capital is also a subsidiary of CIT Group, Inc., making CIT Capital and CMS affiliated companies. Lew Decl., R. 162-1 ¶ 3.

[4] Key man life insurance protects a business if a key employee dies or becomes disabled. The business pays for and is the beneficiary of the policy.

Diamond automatically breached the Factoring Agreement with CIT Group. Franklin Dep., R. 117-2 at 22, Ex. 3 at 95. Both CIT Capital USA and CIT Group, though, generously waived these defaults and continued their relationship. *Id.* at 96; Lew Dep., R. 117-5 at 6, Ex. 15 at 39.

Unfortunately, those defaults were only the start of Black Diamond's problems. Black Diamond's cash flow was trickling instead of gushing. *See* Lew Dep., R. 117 -5 at 7, Ex. 15 at 43. So from October 2006 to August 2007, the company repeatedly turned to Commodities in the hopes of restructuring the May 2006 Coal Supply Agreement to get more advance financing. Commodities agreed to four such Amendments. Commodities paid an upfront lump sum to Black Diamond for each Amendment, totaling $5.6 million across the four Amendments. In return, Black Diamond (1) reduced the monthly per-ton price of coal paid by Commodities, (2) reduced the minimum quantity of coal Commodities had to purchase, or (3) changed the delivery method in Commodities' favor. *See* Amend. No. 1, R. 117-7 Ex. 37; Amend. No. 2, R. 117-7 at 93, Ex. 38 at Constellation-0003735; Amend. No. 3, R. 117-8 at 2, Ex. 39 at CIT00020; Amend. No. 4, R. 117-8 at 7, Ex. 40 at Constellation-0003748. Black Diamond therefore did not factor any of these Amendments with CIT Group. *See, e.g.*, Lew Dep., R. 117-5 at 12 Ex. 15 at 139–40; Franklin Dep., R. 117-2 at 7–10, Ex. 3 at 35, 38, 43, 47; *see also* R. 117-7 Ex. 32 (omitting any mention of advances against the Amendments from CIT Group's internal accounting records).

Meanwhile, even the influx of cash from Commodities was not patching the leak in Black Diamond's cash flow fast enough. The company continued to have trouble producing the minimum coal required by its loan agreement with CIT Capital USA, leading to further defaults under that agreement and the Factoring Agreement with CIT Group. Franklin Dep.,

R. 117-2 at 29–30, Ex. 3 at 129–30. In November 2006, in exchange for waiving these latest defaults and continuing to receive advance funds under the Factoring Agreement, Black Diamond gave CIT Group an additional security interest in its entire coal inventory. Credit & Inventory Security Agreement, R. 117-7 at 2, Ex. 30 at 1; *see also* Lew Dep., R. 117-5 at 7, Ex. 15 at 42–43. Neither CIT Group nor Black Diamond forwarded this Credit and Inventory Security Agreement to Commodities or told Commodities about its existence. Nelson Dep., R. 117-3 at 46, Ex. 8 at 43; Franklin Dep., R. 117-2 at 30, Ex. 3 at 133; Sergent Dep., R. 117-1 at 39, Ex. 2 at 138. So of course, Commodities did not amend its Collateral Agent Agreement with Black Diamond and the Bank of New York to reflect this new agreement. Franklin Dep., R. 117-2 at 31–32, 35, Ex. 3 at 141–43, 157; P. Thompson Aff., R. 120 ¶ 11; Sergent Dep., R. 117-1 at 39, Ex. 2 at 139.

Buoyed by CIT Group's and Commodities' accommodations, Black Diamond entered into five more Coal Supply Agreements with Commodities during September and October 2007. *See* R. 117-5 at 46, Ex. 19 (listing agreements). Although these contracts contained different price and quantity terms from the May 2006 Coal Supply Agreement, they had nearly identical provisions relating to default, termination damages, liquidated damages for missed deliveries, and payment rights. See R. 117-5 at 49, Ex. 20. The Netting Provisions allowed Black Diamond and Commodities to net any payment obligations between them for the same commodity that were due in the same month. R. 117-4 at 17, Ex. 9 at CIT0550 ¶ 16. For example, if Black Diamond owed $100,000 and Commodities owed $200,000 in the same month, then Commodities owed Black Diamond the net, or $100,000. Without the Netting Provision, Black Diamond and Commodities would end up in the same place (Commodities paying $100,000) but in a more inefficient manner (with each party actually

exchanging their respective payments). Black Diamond and Commodities specifically preserved the parties' netting rights under the May 2006 Coal Supply Agreement in their Collateral Agent Agreement with the Bank of New York. R. 117-5 at 28, Ex. 17 at CIT0308.

That takes care of how Commodities would pay for the coal, but how would Black Diamond deliver the coal? Under the May 2006 Coal Supply Agreement and the other Coal Supply Agreements, Black Diamond agreed to deliver the coal to a train or truck chosen by Commodities.[5] Once Black Diamond placed the coal on the train or truck, Commodities took title to the coal and assumed responsibility for transporting the coal to its final destination. *Accord* R. 117-6 at 11–12, Ex. 23 art. 3.3(a) (explaining these standard delivery terms). If Black Diamond missed any deliveries or did not deliver the minimum amount of coal each month, then it owed Commodities liquidated damages based on the "positive difference" between the fixed contractual price and the spot-market cost of coal. *See, e.g.*, R. 117-4 at 16, Ex. 9 at CIT0549 ¶ 13(a).

Naturally, these agreements contemplated the possibility of gloomier days. They established more than thirteen Events of Default, including paying late and going bankrupt. R. 117-4 at 13–14, Ex. 9 at CIT0546–47 ¶ 12(a)(viii). But an Event of Default did not automatically end the contract. Instead, the non-defaulting party could choose to either keep the agreement alive by suspending performance until the breach is cured or end the contract early by choosing an early termination date. *Id.* at CIT0548 ¶ 12(b). The latter path meant that the non-defaulting party would calculate a Termination Payment "representing the 'single net amount' due between the parties." *The CIT Grp./Comm. Servs., Inc. v.*

---

[5] This delivery method is designated in the agreements by the term "FOB [destination]," or "Freight on Board," which indicates the destination to which the seller is liable for delivering the goods. Here, the agreements contained "FOB railcar" or "FOB truck" delivery terms. R. 117-4 at 3, Ex. 9 at CIT0536 ¶ 1.

*Constellation Energy Commodities Grp. (In re Black Diamond)*, No. 08-7017, 2011 WL 6202905, at *4 (Bankr. E.D. Ky. Dec. 13, 2011).

Black Diamond also represented that the coal sold to Commodities would "be free from all liens, encumbrances, and claims." R. 117-4 at 11, Ex. 9 at CIT0544 ¶ 10. Not only was this representation standard industry practice, *see, e.g.*, Mullins Dep., R. 117-6 at 17, Ex. 24 at 17, but it was also especially important to Commodities. As part of reselling some of the purchased coal to other buyers, Commodities promised those downstream buyers that the coal was free of all liens. First P. Thompson Aff., R. 120 ¶ 7(d).

Although CIT Group was well aware of these agreements, it was particularly concerned about the Netting Provisions. R. 117-6 at 2, 4, 6–7, Ex. 22 at CIT 1752, 1754, 1891–92. CIT Group had every right to be worried. The text of the coal supply agreements gave Commodities a certain window after each monthly invoice to pay for the coal—ninety days during the first year and sixty days after that. R. 117-4 at 7–8, Ex. 9 at CIT0540–41 ¶ 8(b). When things ran smoothly, those invoices of coal sales would give CIT Group a security interest in the account receivables generated by Commodities' purchases. Yet if Black Diamond breached any of the coal supply agreements during this window, Black Diamond might owe Commodities a Termination Payment, and Commodities could net its obligations to Black Diamond against that Termination Payment. Depending on the numbers, that offset could wipe out Commodities' obligation to (and thus, its account receivable with) Black Diamond. In effect, Commodities' broad netting rights could erase CIT Group's security interest in Commodities' account. That would leave CIT Group in the hole, having advanced funds to Black Diamond in exchange for a security interest that evaporated. With Commodities representing fifty percent or more of Black Diamond's factored accounts, CIT

Group's hole could be very deep indeed. R. 117-6 at 2, 4, 6–7, Ex. 22 at CIT 1752, 1754, 1891–92; *see also* R. 117-4 at 58, Ex. 28 at CIT0284. Despite identifying this risk, though, CIT Group did not object to the Netting Provisions. *E.g.*, Hegger Dep., R. 117-4 at 45, Ex. 12 at 36–37.

With the song and dance out of the way, the main act could begin. Between December 16, 2007, and February 4, 2008, Black Diamond delivered twenty-six invoiced shipments of coal to Commodities, totaling $8,121,073.52.[6] *See* R. 117-3 at 39, Ex. 7 at Constellation-0005425. In addition, there were five uninvoiced deliveries of coal from Black Diamond to Commodities, totaling $1,680,615.50.[7] *See id.* at Constellation-0005426. Consistent with the Factoring Agreement, Black Diamond submitted the invoices to CIT Group for review. Lew Dep., R. 117-5 at 3–4, Ex. 15 at 27–30; Hegger Dep., R. 117-4 at 42–43, Ex. 12 at 21–22, 39. CIT Group reviewed each invoice before advancing funds to Black Diamond to ensure "that there were no other sales that were not in . . . the ordinary course of business." Lew Dep., R. 117-5 at 3, Ex. 15 at 29. After determining that each of the twenty-six invoices involved a sale of coal made in the ordinary course of Black Diamond's business, CIT Group approved and advanced funds to Black Diamond under the Factoring Agreement. *Id.*

This relationship between Commodities and Black Diamond, though, was not just a one-way street. Commodities was not the company's only customer. On three occasions in

---

[6] A twenty-seventh invoice, No. 11-001108, involved a shipping charge and not a coal delivery. R. 117-6 at 29, Ex. 26 at Constellation-004827; Second Hoskins Aff., R. 156 ¶ 12. See *The CMS/Comm. Servs., Inc.*, No. 08-7017, 2011 WL 6202905, at *9 for a chart detailing each of the invoiced deliveries, and see R. 117 Ex. 33 for invoices generated through coal sales to Commodities.

[7] See *The CMS/Comm. Servs., Inc.*, No. 08-7017, 2011 WL 6202905, at *10 for a chart detailing each of the uninvoiced deliveries.

January 2007 and January 2008, Black Diamond purchased coal from Commodities to meet its delivery obligations to other purchasers. R. 117-5 Ex. 19. Unavoidably, Black Diamond and Commodities sometimes had offsetting obligations to deliver coal to each other. Rather than swapping coal—incurring needless shipping charges and risking an accident during delivery—they "netted" their delivery obligations through an accounting practice called "bookouts."[8] Lew Dep., R. 117-5 at 9–10, Ex. 15 at 115–21. For example, if Commodities owed 100 tons of coal to Black Diamond and Black Diamond owed 50 tons to Commodities, then Commodities would simply deliver the offset—50 tons—to Black Diamond. *See* Savage Dep., R. 117-1 at 5–6, Ex. 1 at 24–33 (explaining bookouts). CIT Group agreed to factor several bookout invoices for Black Diamond after confirming the bookout transactions with Commodities. R. 117-7 at 77–78, Ex. 35 at CIT5811–12.

This labyrinth of relationships quickly collapsed under the weight of Black Diamond's obligations to Commodities. Even though the Amendments and the practice of bookouts reduced the quantity of coal that Black Diamond had to deliver to Commodities each month, Black Diamond still failed to deliver the minimum amount of coal to Commodities in January 2008. R. 117-8 at 22, Ex. 43 at Constellation-0005420. This missed delivery caused Commodities to incur $533,000 in liquidated damages under the Coal Supply Agreements. R. 117-4 at 16, Ex. 9 at CIT0549; R. 117-8 at 21, Ex. 43 at Constellation-005419. That speed bump turned into a brick wall the next month. Black Diamond's deliveries became sporadic throughout February with Black Diamond eventually failing to deliver over 145,400 tons of coal to Commodities and resulting in $6,016,766.25 in liquidated damages. R. 117-8 Ex. 42; R. 117-8 at 21-23, Ex. 43 at Constellation-0005419,

---

[8] See R. 117 Ex. 34 for invoices generated by bookout transactions.

0005421. Black Diamond could not afford to pay any of the liquidated damages owed to Commodities. R. 117-8 Ex. 42.

No surprise, then, that Black Diamond was also unable to pay for the $2,758,268.51 in coal that it purchased from Commodities during January and February 2008. R. 117-7 at 56, Ex. 33 at Constellation-0005403; Hoskins Aff., R. 118 ¶¶ 7–9. Or for the $1,604,000 in bookout invoices owed to Commodities during that same time. Hoskins Aff., R. 118 ¶¶ 11–12; R. 117-3 at 41, Ex. 7 at Constellation-0005427. During these two months, Black Diamond racked up a bill of $4,326,268.51 to Commodities. R. 117-3 at 41, Ex. 7 at Constellation-0005427.

Black Diamond defaulted for a third time under the Factoring Agreement, causing CIT Group to terminate that agreement on February 11, 2008. *See* R. 117-8 Ex. 44; *see also* Franklin Dep., R. 117-2 at 24–25, Ex. 3 at 105–06. With its funding gone, Sergent told Commodities that Black Diamond could not deliver any more coal to Commodities until it secured another source of funding. P. Thompson Aff., R. 157 ¶ 31. That hope did not last long: on February 19, CIT Group, CIT Capital USA, and Prudential (another lender) filed an involuntary petition under Chapter 11 against Black Diamond. R. 117-8 Ex. 45. Less than a month later, the United States Bankruptcy Court for the Eastern District of Kentucky entered an order for relief

Black Diamond's bankruptcy triggered a more serious problem. Under all of the coal supply agreements with Commodities, Black Diamond's bankruptcy was an Event of Default. Seeing the company's downward spiral, Commodities chose to terminate all of its agreements with Black Diamond. Commodities immediately terminated the additional Coal Supply Agreements, establishing March 13, 2008, as the Early Termination Date. R. 117-8 at

45–47, Ex. 47 at CIT0890–92. Commodities calculated the net Termination Payment owed by Black Diamond for breaching those contracts—a whopping $82,771,818.57. R. 117-8 at 53, Ex. 47 at CIT0898. This payment included not only past-due amounts but also future losses for the undelivered tons of coal that Black Diamond had promised to deliver during the remainder of the contracts. *Id.* The net Termination Payment, as its name implies, also included offsets of any amounts that Commodities owed Black Diamond. *Id.* at CIT0895. And after the waiting period under the Collateral Agent Agreement expired, Commodities also ended the May 2006 Coal Supply Agreement and claimed an additional $11,002,331 in termination damages. *Id.* at CIT0900–08.

During the bankruptcy, Commodities filed a proof of claim to recover its total termination damages.[9] *Id.* at CIT0884. CIT Group, meanwhile, wanted to recoup its losses from both companies. On August 15, 2008, CIT Group filed a proof of claim seeking $14,109,49.55 for amounts owed by Black Diamond under the invoiced deliveries. Franklin Dep., R. 117-2 at 36 Ex. 3 at 230–33; R. 117-9 Ex. 48. Although CIT Group knew it could not recover from both Black Diamond's estate and Commodities, *see* Franklin Dep., R. 117-2 at 36, Ex. 3 at 233, CIT Group did not want to leave anything to chance. So about two weeks later, CIT Group initiated an adversary proceeding against Commodities and its parent, Constellation, eventually settling on six counts of relief. Second Am. Compl., R. 93. Its six counts distill to four arguments for recovery:

---

[9] Although Commodities's termination damages total $93,215,149.58, *see* R. 117 Ex. 42, its proof of claim sought $93,774,149.57. As the Bankrupcy Court noted, this discrepancy appears to result from an accidental double-counting of $559,000 for the February 2008 bookout. *See The CMS/Comm. Servs., Inc.*, No. 08-7017, 2011 WL 6202905, at *16 n.22 (comparing R. 117 Ex. 42 to R. 117 Ex. 43 at Constellation-0005419).

(1) *Conversion claim.* The Credit and Inventory Security Agreement gave CIT Group a security interest in Black Diamond's coal inventory, some of which Commodities illegally converted by accepting delivery from Black Diamond. *Id.* ¶¶ 57–61. CIT Group estimates the market value of the converted coal at $20,000,000. *Id.*

(2) *Contract and quasi-contract claims.* The Factoring Agreement gave CIT Group a security interest in Black Diamond's accounts receivable generated by coal sales to Commodities, and Commodities owes CIT Group $15,598,859.40 under these accounts. *Id.* ¶¶ 33–51.

(3) *Amendment claims.* CIT Group's security interest in Black Diamond's accounts receivable extends to the lump sums paid by Commodities to Black Diamond under the four Amendments to the Coal Supply Agreements. *Id.* ¶¶ 52–54. CIT Group claims that Commodities' payments to Black Diamond under the Amendments did not discharge Commodities' obligation to pay CIT Group and Commodities therefore owes CIT Group $5,600,000. *Id.* ¶ 55–56.

(4) *Claims against Constellation.* Because Constellation guaranteed Commodities' payments to Black Diamond, Constellation is allegedly on the hook for whatever Commodities owes on the Amendment and contract claims.

Both sides moved for summary judgment on all claims. R. 114; R. 115. The Bankruptcy Court granted summary judgment in favor of Commodities and Constellation on all of CIT Group's claims. *The CIT Grp./Comm. Servs., Inc.*, No. 08-

13

7017, 2011 WL 6202905, at *17 (Bankr. E.D. Ky. Dec. 13, 2011). CIT Group appealed. R. 209.

## DISCUSSION

The bankruptcy court granted summary judgment. The standard for summary judgment is the same in bankruptcy courts as it is in federal district courts. Summary judgment is only appropriate if there is no genuine issue of material fact. See Fed. R. Bankr. P. 7056 (cross-referencing Fed. R. Civ. P. 56); In re *Howard Batie*, 995 F.2d 85, 90 (1993). The parties do not dispute that New York law governs this case. *See* R. 117-4 at 18, Exh. 9.

## I.      Conversion Claim

CIT Group alleges that Commodities is liable for conversion under New York law. Conversion occurs when a person voluntarily interferes with someone else's superior property interest by using or controlling that property. *Thyroff v. Nationwide Mut. Ins. Co*, 460 F.3d 400, 403–04 (2d Cir. 2006). The key question here is whether CIT Group had a property interest at the time of the alleged conversion. CIT Group claims that it received a certain kind of security interest in Black Diamond's coal inventory—an inventory lien—in exchange for advancing additional funds to Black Diamond under the Credit and Inventory Security Agreement. Second Am. Compl., R. 93 ¶ 61.

According to CIT Group, this inventory lien still existed when Commodities converted the coal delivered under the Coal Supply Agreements. *Id.* That is the default rule: under the New York Uniform Commercial Code ("U.C.C."), a security interest generally "continues in collateral notwithstanding sale, exchange, or other disposition," N.Y.U.C.C. § 9-315(a)(1), and "is effective . . . against purchasers of the collateral," N.Y.U.C.C. § 9-201(a), such as Commodities.

There are several exceptions, though, two of which the Bankruptcy Court relied upon in holding that CIT Group's inventory lien had been extinguished. *The CIT Grp./Comm. Servs., Inc.*, 2011 WL 6202905, at *17. First, a buyer who achieves a special status—called a "[b]uyer in the ordinary course of business"—takes the property free of the secured party's interest. N.Y.U.C.C. § 9-320(a). The Bankruptcy Court held that Commodities was a buyer in the ordinary course of business, allowing it to defeat CIT Group's inventory lien. *The CIT Grp./Comm. Servs., Inc.*, 2011 WL 6202905, at *17. Second, a security interest is extinguished if the "secured party authorized the [sale] free of the security interest." N.Y.U.C.C. § 9-315(a)(1). The Bankruptcy Court held that CIT Group implicitly authorized the sales of Black Diamond's coal to Commodities free of the inventory lien. *The CIT Grp./Comm. Servs., Inc.*, 2011 WL 6202905, at *28. Because the Bankruptcy Court correctly granted summary judgment based on Commodities' buyer-in-the-ordinary-course-of-business status, the Court need not decide whether CIT Group also implicitly authorized the sales free of its inventory lien.

###    A.    Did Commodities Take the Coal In Good Faith Without Knowledge That Its Purchases Violated CIT Group's Inventory Lien?

CIT Group and Commodities agree on the basics: a buyer in the ordinary course of business is a person who buys goods in good faith without knowing that his purchase violates a third party's property interest in those goods. *See* N.Y.U.C.C. § 1-201(9). Consider an example from everyday life. Jennifer goes to her favorite store to purchase a pair of Manolo Blahniks. If the store had acquired those Manolo Blahniks on a loan and used the shoes to secure that loan, then the store's inability to repay the loan would mean that the financier could repossess the shoes from Jennifer. Enter the idea of a buyer in the ordinary course of

business, a legal device that allows a purchaser like Jennifer to "safely buy from a merchant" without "fear that the goods could be repossessed" by the merchant's creditor. In other words, this sacred status permits the buyer to take the goods free of the financier's lien on them. 1B Larry Lawrence, Anderson on the Uniform Commercial Code § 1-201:23 [Rev] (3d ed. 2012). And the financier expects—indeed, hopes!—that the store will sell the Manolo Blahniks. Otherwise, how will the store repay its loan? *Id.* The financier, though, is not left out to dry: A buyer in the ordinary course of business provides "new value" for the goods— either debt in the form of an account receivable or cash proceeds. And the financier receives a substitute interest in that new value once its inventory lien disappears. *See, e.g.*, *Amarillo Nat'l Bank v. Komatsu Zenoah Am., Inc.*, 991 F.2d 273, 277 (5th Cir. 1993).

In purchasing coal from Black Diamond, Commodities qualifies as a buyer in the ordinary course of business. When it purchased the coal, Commodities did not know that its coal purchases violated CIT Group's inventory lien because neither CIT Group nor Black Diamond ever forwarded the Credit & Inventory Security Agreement (which created CIT Group's inventory lien) to Commodities. Nelson Dep., R. 117-3 at 46, Ex. 8 at 43; Franklin Dep., R. 3 at 133; Sergent Dep., R. 117-1 at 39, Ex. 2 at 138. All that Commodities knew about was the Factoring Agreement, which created CIT Group's lien in the accounts receivable arising from Black Diamond's coal sales to Commodities. As to good faith, Commodities and Black Diamond were two sophisticated entities who entered the Coal Supply Agreements at arm's length. CIT Group does not dispute that Black Diamond was actually in the business of mining and selling coal or that Commodities was buying coal for its portfolio as well as to supply various energy providers, including its parent Constellation. Moreover, this arrangement was not a sham: Black Diamond delivered coal to Commodities,

and Commodities faithfully paid nearly fifty-million dollars for its purchases until Black Diamond's bankruptcy. *See The CIT Grp./Comm. Servs., Inc.*, 2011 WL 6202905, at *19 & n.25. CIT Group does not point to any facts indicating that Commodities paid less than fair-market value for the coal. Consequently, all signs point to Commodities' good faith in buying the coal.

CIT Group nonetheless insists otherwise. According to CIT Group, Commodities (1) knew about CIT Group's inventory lien when it entered into the Coal Supply Agreements, and (2) lacked good faith because it intentionally structured its coal purchases to defeat CIT Group's inventory lien. Both of these arguments fall flat.

As to Commodities' alleged knowledge of CIT Group's inventory lien, CIT Group points to only two pieces of evidence: CIT Group's proposal of a financing arrangement with Black Diamond and an unexecuted, draft version of the Credit Security and Inventory Agreement. *See* Appellant's Br. at 8–10. Yet these documents indicate only that CIT Group intended to obtain an inventory lien in Black Diamond's coal, not the actual existence of such a lien. Commodities therefore could not have known that its purchases would violate CIT Group's inventory lien because Commodities never found out that CIT Group's inventory lien ever came into existence. What's more, Commodities' mere knowledge of CIT Group's inventory lien is not enough. Under New York law, CIT Group must show that Commodities had actual knowledge that buying Black Diamond's coal violated CIT Group's inventory lien—not just knowledge that the lien existed. *See* N.Y.U.C.C. § 9-320(a) ("[A] buyer in the ordinary course of business . . . takes free of a security interest created by the buyer's seller, *even if the security interest is perfected and the buyer knows of its existence*." (emphasis added)); N.Y.U.C.C. § 1-201(25)(c) (defining "knowledge" as "actual knowledge

of a fact"); N.Y.U.C.C. § 9-320 cmt. 3 (explaining that the buyer takes goods free of a lien "if the buyer merely knows that the security interest covers the goods," but takes goods subject to the lien "if the buyer knows, in addition, that the sale violates a term in an agreement with the secured party"); *see also United States v. Handy & Harman*, 750 F.2d 777, 781–82 (9th Cir. 1984) (same). Because Commodities did not know that the inventory lien existed at the time of its purchases, there is no way that Commodities could have known that its purchases actually violated the lien. It is entirely possible, for example, that CIT Group and Black Diamond had not yet executed the Credit & Inventory Security Agreement when the Coal Supply Agreements were finalized or even that CIT Group and Black Diamond had decided not to move forward with their relationship at all. Indeed, in the Coal Supply Agreements, Black Diamond specifically guaranteed that it "had good title" to the coal, had "the right to sell" the coal to Commodities, and "that [the coal] *shall be free from all liens, encumbrances and claims.*" R. 117-4 at 11–12 Ex. 9 § 10 (emphasis added). Consequently, Commodities acquired the coal without knowledge that its purchases violated CIT Group's inventory lien.

CIT Group also argues that Commodities purchased the coal in bad faith because Commodities specifically designed the Coal Supply Agreements to defeat CIT Group's inventory lien. CIT Group interprets the Commodities' Coal Supply Agreements in two parts: one that calls for regular purchases of coal from Black Diamond (the "Physical Delivery Component") and a more sinister part that contained "Hedging Obligations through which Black Diamond and Commodities bet on the market price for coal futures." Appellant's Br. at 29. This is confirmed by the Coal Supply Agreements themselves, CIT Group argues, which represent that the agreements are "forward contract[s]." *Id.* at 29 n.19.

18

When Commodities eventually won these bets, the Coal Supply Agreements required Black Diamond to pay Commodities its winnings (the "Hedging Bet Offsets").

This is a curious argument: why would Commodities have tried to avoid an inventory lien that it did not know about? Putting that existentialist problem aside, CIT Group's interpretation of the Coal Supply Agreements does not match reality. The Coal Supply Agreements do not mention "hedging," "futures trading," or anything of the sort. And CIT Group's reliance on the agreements' nature as "forward contract[s]" is mistaken. Negotiated on a futures exchange, a futures contract is a standardized agreement frequently used by speculators gambling on whether an assets price will increase or decrease by some specified future date. *CFTC v. Erskine*, 512 F.3d 309, 323–24 (6th Cir. 2008); *see also Sprague Energy Corp. v. Levco Tech, Inc.*, No. 3:09-CV-29-RNC, 2009 WL 1374593, at *9 (D. Conn. May 11, 2009). But a futures contract "does not involve a sale *of the commodity* at all. It involves a sale *of the contract*." *CFTC v. Zelener*, 373 F.3d 861, 865 (6th Cir. 2004); *Erksine*, 512 F.3d at 324–25 (approving of this distinction). In other words, in "organized futures markets, people buy and sell contracts, not commodities." *Zelener*, 373 F.3d at 865. By contrast, a forward contract is a customized and private agreement "to buy or sell some agreed-upon quantity *of some commodity* at some agreed-upon price at an agreed-upon time in the future." *Sprague Energy Corp.*, No. 3:09-CV-29-RNC, 2009 WL 1374593, at *9 (emphasis added); *Erskine*, 512 F.3d at 324–25. Contrary to CIT Group's suggestion otherwise, the text of the Coal Supply Agreements do not indicate that Commodities traded coal futures with Black Diamond.

So where in the agreements did Commodities hide the alleged "Hedging Bet Offsets"? According to CIT Group, the "Hedging Bet Offsets" were nothing more than the

agreements' terms addressing "default, acceleration of performance[,] and imposition of termination and liquidation damages." Appellant's Br. at 31. CIT Group does not explain why these standard commercial features, found in most contracts, were transformed into something more sinister in this case.

### B.    Did Commodities Acquire the Coal As Security for a Debt?

To defeat Commodities' buyer-in-the-ordinary-course-of-business status, CIT Group makes a more fundamental argument: that Commodities acquired the coal "as security for" a debt (and thus did not "buy" the coal). Under New York law, a person does not qualify as a buyer in the ordinary course of business when he "acquires goods . . . as security for or in total or partial satisfaction of a money debt." Rightfully so—in those circumstances, the person is a creditor, not a buyer, who is taking the goods as collateral for a loan. *See* 1 Lawrence, Anderson on the Uniform Commercial Code § 1-201:136. Suppose Claire decides to buy a car. Lacking the cash to do so, she gets a loan from Fifth Third Bank, putting her soon-to-be car up as collateral for the loan. She speeds off into the sunset on a six-month road trip, tragically forgetting to make her monthly payments on the loan. When she returns home, Fifth Third Bank repossesses her car. That repossession, of course, does not make Fifth Third Bank a buyer in the ordinary course of business because it took the car to satisfy Claire's outstanding loan.

CIT Group argues that, like Fifth Third Bank, Commodities took the coal as security for a debt. According to CIT Group, Commodities took the coal subject to the Netting Provisions, which gave Commodities the right to offset its debt for purchasing the coal against future mutual debts owed by Black Diamond.

20

CIT Group's argument is too clever by half. There is no evidence that Commodities took the coal as security for any debt. At the time Commodities acquired the coal, Black Diamond had not incurred any debt to Commodities; its debt (the Liquidation and Termination Damages) did not arise weeks later until Black Diamond's bankruptcy. As a result, Commodities did not acquire the coal to secure any existing debt.

To the extent that CIT Group argues that Commodities acquired the coal as security for Black Diamond's *future* debt, that argument is unpersuasive. Of course, the U.C.C. does not define when to measure buyer-in-the-ordinary-course-of-business status. And although courts disagree about when a buyer in the ordinary course of business "acquires" goods, only two events "have received serious consideration": when the goods are identified for purchase and when title is transferred to the buyer. *Havens Steel Co. v. Commerce Bank, N.A.*, 317 B.R. 75, 82 (W.D. Mo. 2004). Under even the later of the possibilities—transfer of title— Commodities' status as a buyer in the ordinary course of business attached when the coal was loaded onto its railcars or trucks, a time when Black Diamond did not owe any debt to Commodities.

CIT Group cries foul, claiming that the language of the statute is not limited to goods acquired as security for *pre-existing* debts. According to CIT Group, the U.C.C. excludes a person who "acquires goods as security for or in total satisfaction of a money debt," regardless of whether that money debt arises before or after the acquisition of the goods. CIT Group, though, does not cite a single case in support of its interpretation. Indeed, cases across the country have applied this language only to purchasers who acquired goods to

offset the seller's pre-existing or antecedent debt.[10] The text of § 1-201(9) does not support CIT Group's reading. A person "acquires goods . . . as security for . . . a money debt," when the goods are acquired at a time when the debt exists but has not accrued. A person "acquires goods . . . in total or in partial satisfaction of a money debt" when the goods are acquired at a time when the debt has accrued.

Put differently, a person who takes goods "as security for" a debt is excluded from being a buyer in the ordinary course of business because he does not give any new consideration for the goods. *See, e.g.*, *Handy & Harman*, 750 F.2d at 781. And without new consideration, the financier's security interest in the inventory is simply extinguished, unable to attach any new value. *Id.* The U.C.C. thus recognizes that a creditor, who does not provide new value for the goods, should not be able to escape the financier's inventory lien because the financier would be left without any security interest. *Id.*

But CIT Group was not left so high and dry once Commodities acquired Black Diamond's coal. Instead, Commodities provided new value: its debt to Black Diamond in the form an account receivable. And under the Factoring Agreement and Collateral Agent Agreement, CIT Group's security interest in the coal transferred to that account receivable when Commodities purchased the coal.

CIT Group's real concern is that the account receivable became uncollectable when Black Diamond entered bankruptcy. In doing so, Black Diamond breached the Coal Supply Agreements, triggered the termination and liquidation damages, and allowed Commodities

---

[10] *See, e.g., Fleet Capital Corp. v. Yamaha Motor Corp.*, 2002 WL 31174470, at *17 (S.D.N.Y. 2002); *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 649 (5th Cir. 1991); *United States v. Handy & Harman*, 750 F.2d 777, 782 (9th Cir. 1984).

the chance to argue it could offset its debt to Black Diamond with those damages. But CIT Group explicitly assumed that risk, *see supra* at page 8, and its efforts to mitigate that risk after the fact are in vain. The bankruptcy court correctly granted Commodities summary judgment and denied CIT Group summary judgment on the conversion claim.

## II.    Contract and Quasi-Contract Claims

CIT Group seeks $9,998,859.40 from Commodities for coal that Black Diamond delivered to Commodities and Commodities did not pay for. The deliveries include twenty-seven invoiced deliveries as well as almost 45,000 tons of coal delivered without invoices between November 2007 and February 2008. Second Am. Compl., R. 93 at ¶¶ 31–32, 39–51. CIT Group also seeks $15,598,859.40 in damages for breach of the 2006 Coal Supply Agreement. *Id.* at ¶¶ 33–38.

The bankruptcy court found that CIT Group did not have standing to raise a breach of contract claim against Commodities because it was not a party to the contract between Commodities and Black Diamond. None of the cases relied on by the bankruptcy court support its conclusion. Those cases hold only that third parties cannot assert breach of contract claims on behalf of a party to a contract. Here, CIT Group is an assignee. The assignment granted CIT Group the right to assert all claims Black Diamond could have raised against Commodities. CIT Group is also subject to all of the defenses and claims of recoupment Commodities could have raised against Black Diamond. *See* N.Y.U.C.C. § 9-404(a); *Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989) ("It has always been the law in New York that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment.").

Black Diamond delivered coal to Commodities on December 22, 2007. Commodities did not pay the invoice. On February 19, 2008, Black Diamond was forced into bankruptcy. CIT Group argues Commodities breached the 2006 Coal Supply Agreement by failing to pay the invoice on time. CIT Group believes the deadline was January 21, 2008. Commodities believes the deadline was February 22, 2008. The difference matters because if the deadline was after the date of bankruptcy, then Black Diamond defaulted on the 2006 Agreement first. If Black Diamond breached first, Commodities has a right to the termination payment and liquidated damages. If the deadline was before the date of the bankruptcy, then Commodities might have breached first and might lose its rights under the contract. The bankruptcy court determined that the deadline was February 22, 2008, meaning Commodities did not breach the 2006 Coal Supply Agreement. It therefore went on to find that Commodities could use its right to the termination payment and liquidated damages under the 2006 Coal Supply Agreement to offset the amount it owes CIT Group for the outstanding deliveries.

The December 22 delivery was not subject to a written contract. *See The CIT Grp./Comm. Servs, Inc. v. Constellation Energy Commodities Grp., Inc. (In re Black Diamond Mining Co., LLC)*, No. 12-16-ART (E.D. Ky. 2012), R. 16 at 30. There are six pieces of evidence related to the deadline.

(1)     On February 5, 2008, David Hegger, the Black Diamond CFO, asked Brigit Schaffer, a Commodities employee, when Commodities would pay for certain deliveries. On February 6, 2008, Schaffer replied that payment for "the December invoices" would be on February 22, 2008. On February 8, 2008, Hegger replied and did not confirm or object to that deadline, but instead asked about the status of a separate payment. *See* R. 163-1 at 3–4, Exh. 1.

(2)     In a January 14, 2008, e-mail to Donna Lewis in the Audit Department of CIT Group, Schaffer listed invoices and due dates. The December shipments are listed with a January 21, 2008, due date. *See* R. 119-10 at 29–31, Ex. 22.

(3)     In a March 11, 2008, e-mail Joe Funk of Black Diamond states that the December shipments were on a thirty-day payment schedule, which corresponded to a January 21, 2008, due date.

(4)     The prior coal supply agreements between the parties used a sixty-day payment schedule. R. 117 at 7–8, Ex. 9.

(5)     An affidavit from Phillip Hoskins stated that the terms of the oral agreement governing the December shipments were the same as all the written contracts; that is, the deadline was February 22, 2008, sixty-days after delivery. R. 156 at ¶¶ 8–9.

(6)     The December invoices state that the deadline for payment is January 21, 2008. R. 119-8 at 1, Ex. 15.

The bankruptcy court seemed to settle on a February 22, 2008 deadline. It did so citing only pieces of evidence (1), (4), and (5). Before the bankruptcy court, and again before this Court, CIT Group argued that the Schaffer-Hegger e-mail exchange was hearsay. *See* R. 171 at 10, CIT Reply Br. (noting Commodities did not authenticate the e-mail exchange or question Hegger about the contents); *The CIT Grp./Comm. Servs, Inc. v. Constellation Energy Commodities Grp., Inc. (In re Black Diamond Mining Co., LLC)*, No. 12-16-ART (E.D. Ky. 2012), R. 16 at 75. Commodities did not respond to the hearsay claim below. Commodities also did not respond before this Court. The bankruptcy court did not address the argument. Hearsay evidence is inadmissible on summary judgment. *See Carter v.*

*University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003). However, this Court cannot determine whether the e-mail is inadmissible hearsay. It is possible that the e-mail falls within the "business records" exception in Federal Rule of Evidence 803(6), but because Commodities did not respond, it is not clear whether there is a foundation for the exception. For example, it is not clear from the evidence whether (1) "the record was kept in the course of a regularly conducted activity of a business," (2) "making the record was a regular practice of that activity," or (3) "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). A limited remand is in order for the bankruptcy court to address the hearsay issue.

On remand, the bankruptcy court should address the consequences of the hearsay determination. If the Schaffer-Hegger e-mail exchange is inadmissible, is there a genuine issue of material fact with respect to deadline for payment on the December 22 shipments? The question will be whether the Hoskins affidavit stands up against the remaining four pieces of evidence. And if the Schaffer-Hegger e-mail exchange is admissible, the bankruptcy court should address pieces of evidence (2), (3), and (6) when determining whether there is a genuine issue of material fact with respect to the December 22 shipment due date. It did not address those pieces of evidence in the opinion below. Finally, if the due date was January 21 2008, and Commodities did breach the 2006 Coal Supply Agreement, the bankruptcy court should re-assess its decision on the breach of contract and outstanding invoice claims. It will need to determine whether, as a matter of New York law, Black Diamond waived the breach. If not, the bankruptcy court will need to determine what effect that has on Commodities' ability to claim that the termination payment and liquidated

damages under the 2006 Coal Supply Agreement offset its obligations to CIT Group on the outstanding deliveries.

Finally, CIT Group argues Commodities breached the 2006 Coal Supply Agreement when it failed to provide an amended guaranty for each of the subsequent Coal Supply Agreements. R. 117-4 at 11, Ex. 9 at CIT0544. The bankruptcy court correctly determined that CIT Group's claim fails as a matter of law because Black Diamond waived any breach by Commodities. Under New York law, waiver requires a "voluntary and intentional abandonment of a known right." *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. School Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995). Waiver can be established "affirmative conduct by failure to act so as to evince an intent not to claim a purported advantage." *Id.* As the bankruptcy court noted, Black Diamond never stated that Commodities was in breach, never suspended performance due to breach, and never issued a notice of termination or default under the 2006 Coal Supply Agreement. *The CIT Grp./Comm. Servs., Inc.*, 2011 WL 6202905, at *33. CIT Group argues that the lack of any evidence that Black Diamond did not waive the breach does not matter because the 2006 Coal Supply Agreement actually prohibits waiver. But there is no such prohibition. The provision CIT Group points to says only that waiver of any one breach cannot be construed as waiver of any other breach. R. 119-11 at 17, Ex. 26 at CONSTELLATION-3582. But here, every alleged breach was waived. The last Coal Supply Agreement was dated October 1, 2007. R. 117-5 at 46, Ex. 19. There is no evidence that Black Diamond ever intended to assert its right to claim Commodities breached. CIT Group raised the issue of breach for the first time before the bankruptcy court.   Because Black Diamond waived any rights it had stemming from

Commodities' breach, the bankruptcy court correctly determined this breach did not affect Commodities' right to the termination payment and liquidated damages.

## III.    Amendment Claims

Commodities payments to Black Diamond for the four Amendments to the 2006 Coal Supply Agreement were $5.6 million ("the Amendment Payments"). CIT Group argues that Commodities should not have paid Black Diamond, but should have instead paid CIT Group. Second Am. Compl., R. 93 at ¶¶ 52–56. The Factoring Agreement between CIT Group and Black Diamond did not grant CIT Group an interest in the payments for the Amendments, so CIT Group's claim fails.

The Factoring Agreement assigns CIT Group "all accounts arising from [Black Diamond's] sales of coal inventory." R. 117-4 at 56, Exh. 13 at CIT0282. In order for CIT Group to have a right to the Amendment Payments, those payments would have to be "accounts" and "aris[e] from" the sale of coal. The Amendment Payments do not meet either condition.

First, Commodity made the payments as consideration for a modification of the 2006 Coal Supply Agreement. The Factoring Agreement does not define the term "account." N.Y.U.C.C. § 9-102(a)(2) defines "account" as a right to payment for property, services, insurance, a secondary obligation, energy, credit card charges, and lottery winnings. A contract modification does not fall within the terms on that list. Furthermore, Section 4.2 of the Factoring Agreement required Black Diamond to represent and warrant that "each Account is based on a bona fide sale and delivery of coal inventory." R. 117-4, Exh. 13. This provision supports a narrower interpretation of "account." Each "account" (singular) must be based on "a" (singular) sale and delivery of coal. If "account" is given its most natural

28

meaning here, as a sale or delivery of coal, this requirement makes sense. If "account" means something broader, and includes the Amendment Payments, then the representation and warranty requirement ceases to make sense. Black Diamond could not have represented and warrantied that the Amendment Payments were "based on" one sale and delivery because it did not deliver any coal to Commodities in exchange for the Amendment payments.

Even if the Amendment Payments were "accounts," they do not arise from the sale of coal. If Black Diamond delivered coal to Commodities in exchange for the Amendments, there would be invoices. There are no invoices. R. 117-8, Ex. 37–38; R. 117-9, Ex. 39–40. The payments were for the modifications—fewer deliveries, lower prices, and different shipping methods—rather than the sale of coal. CIT Group argues that the payments arose from the sale of coal because the 2006 Coal Supply Agreement governed the sale of coal and the Amendment Payments were consideration for a modification of that Agreement. "Arising from" simply has a narrower meaning than CIT Group wishes to give it. *See, e.g.*, *Golden Pacific Bancorp v. Fed. Deposit Ins. Co.*, 273 F.3d 509, 516 (2d Cir. 2001) (narrowly interpreting contract under New York law on diversity jurisdiction); Black's Law Dictionary (9th ed. 2009) (defining arise as "to originate; to stem from"). Black Diamond was in the coal selling business. Under CIT Group's interpretation, every transaction Black Diamond entered into and received payment for would "arise from" the sale of coal.

The contract terms unambiguously do not cover the Amendment Payments because they did not "arise from" the sale of coal. This explains why Commodities paid the Amendment Payments directly to Black Diamond. Unlike the coal invoices, which required Commodities to pay CIT Group directly, Black Diamond specifically told Commodities to make payments into Black Diamond's accounts. *See* R. 157, Second P. Thompson Aff. at ¶¶

27–30; R. 117-5 at 28–29, Ex. 17 at CIT0308–09. Commodities did so. *See* R. 117-7 at 94, Ex. 38 at Constellation-0003736; R. 117-8 at 3, Ex. 39 at CIT-00021; R.117-8 at 8, Ex. 40 at Constellation-0003749. The bankruptcy court capably summarized the other evidence in the record that shows the parties' actions contradict CIT Group's claim that the Factoring Agreement covered the Amendment Payments. *See The CIT Grp./Comm. Servs., Inc.*, 2011 WL 6202905, at *38–40. CIT Group maintains that the Amendment Payments are "general intangibles," which it has a security interest in under Section 11.1 of the Factoring Agreement. Section 11.1 states that CIT Group gains a security interest in certain listed items only if "the transactions contemplated hereby are recharacterized as a secured loan." R. 117-4 at 61, Exh. 13 at CIT0287. CIT Group does not offer any evidence to show that condition was met. Because the terms of the Factoring Agreement did not grant CIT Group an interest in the Amendment Payments, CIT Group cannot claim that Commodities must pay it $5.6 million.

## IV.    Claims Against Constellation

As explained above, Constellation guaranteed Commodities' payment obligations, such as Commodities' liability for breach of contract, under the 2006 Coal Supply Agreement. *See id.* at ¶¶ 18–19. The bankruptcy court determined that because all of CIT Group's claims failed as a matter of law, Constellation had no liability for any of CIT Group's claims. Commodities' liability for breach of contract will turn on the outcome of the remand. This means that as Commodities' guarantor, Constellation's liability will also turn on the outcome of the remand. Therefore, the bankruptcy court's determination on this issue must also be remanded.

The bankruptcy court correctly determined that with respect to CIT Group's other claims—for payment on the outstanding invoices and for the Amendment Payments—Constellation has no liability to CIT Group. CIT Group concedes that Constellation did not guarantee Commodities' payments for the coal that was delivered by Black Diamond but never paid for by Commodities. Thus, Constellation cannot be liable for those payments. *See* Second Am. Compl., R. 93 at ¶ 31. Finally, Commodities was not required to send the Amendment Payments to CIT Group. Because CIT Group's underlying claim against Commodities for the Amendment Payments fails, its claim against Constellation as Commodities' guarantor fails as well.

## CONCLUSION

Accordingly, the Court **AFFIRMS** the Bankruptcy Court's opinion **IN PART**, **REVERSES IN PART**, and **ISSUES A LIMITED REMAND** for the reasons stated in this opinion.

This the 30th day of September 2012.

**Signed By:**

*Amul R. Thapar*

**United States District Judge**